Receipt #061830

ORIGINAL

ECF

FILED
DEC 20 2004
U.S. COURT OF FEDERAL CLAIMS

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., PLAINTIFF, | § | CASE NO. 04-1786C |
| V. | § | |
| UNITED STATES OF AMERICA, DEFENDANT. | § | COMPLAINT |

## COMPLAINT

Plaintiff, Renda Marine, Inc., complaining of the United States of America, respectfully states the following.

### I.

### Parties

Plaintiff, Renda Marine, Inc. ("Renda"), is a Texas corporation, with its principal place of business in Roanoke, Texas.

Defendant, United States of America, may be served with process through the Attorney General for the United States of America.

### II.

### Jurisdiction

This Honorable Court has jurisdiction for Renda's claims under the Contract Disputes Act, since Renda's claims arose from a United States Government contract, which is subject to that act.

III.

**Venue for Trial**

Renda respectfully requests that trial occur in Houston, Texas, the location where all or most of the claims accrued.

IV.

**Factual Background**

1. Renda was a marine dredging contractor.

2. On about July 29, 1998, Renda submitted a bid to the United States Army Corps of Engineers, Galveston District ("Corps"), for the marine dredging and construction project known as "Contract DACW64-98-C0028, Gulf Intracoastal Waterway, and Mouth of Colorado River, Texas, Boggy Bayou to Colorado River and Navigation Channel and Impoundment Basin, in Matagorda, Texas" ("Project").

3. Among other things, the Project included dredging of the mouth ("Mouth") of the Colorado River, a task that could only occur during periods of favorable weather conditions. Such favorable weather conditions generally only occurred for a few weeks, if at all, each year.

4. On previous projects involving the dredging of the Mouth, the Corps terminated such work for convenience when the weather was adverse or uncooperative.

5. The Corps was also well aware that there was a stretch of the Colorado River just upstream of the Mouth that had to be dredged, but was not in Renda's or any other contractor's contract. This unaccounted for stretch of the Colorado River came to be known as the plug ("Plug").

6. The Corps was well aware that without dredging the Plug, dredging at the Mouth was not urgent, and in fact was wasteful. With the Plug in place, the Mouth would simply shoal, requiring redredging.

7. On about July 29, 1998, the Corps opened Renda's bid for the Project, and Renda was the apparent low bidder.

8. Another bidder, King Fisher Marine Services, protested the award of a contract to Renda for the Project, contending that Renda lacked the capacity of undertaking the work.

9. Renda's bid price for the Project was substantially less than the second lowest bidder, a significant potential savings for the Corps.

10. However, Renda's bid envisioned that Renda would contract with Dredging Supply Company ("DSC") to fabricate and assemble a new dredge, the Millennium. Without the Millennium, Renda would not be able to complete the Project and meet the Project's schedule.

11. Renda made the Corps well aware of Renda's potential acquisition of the Millennium. The Corps investigated the prospective acquisition, and even met with the President of DSC to discuss the fabrication and delivery schedule, and the technical capabilities of the Millennium.

12. By the time that the Corps completed its pre-award investigation of Renda and the Millennium, the Corps was satisfied that with the Millennium, Renda could successfully undertake the Project.

13. The Corps decided to reject the protest of Renda's bid, and to award the contract for the Project to Renda. In so doing, the Corps realized a significant cost savings over having the second lowest bidder perform the work.

14. Unfortunately, due to causes beyond Renda's control, the Millennium was delivered about five months late.

**Mouth of the Colorado**

15. The Corps was well aware that Renda needed the Millennium to dredge the Mouth.

16. Nevertheless, the Corps insisted that Renda attempt to dredge the Mouth before the Millennium arrived on the Project.

17. To accommodate the Corps' requests, Renda attempted to dredge the Mouth with the White Rock, a dredge much smaller than the Millennium. Unfortunately, adverse weather did not permit any significant dredging by the White Rock at the Mouth.

18. Later, Renda attempted to have the St. Charles, a dredge larger than the White Rock, but also smaller than the Millennium, dredge the Mouth. Again, due to adverse weather, the St. Charles was unable to achieve significant progress.

19. In fact, rough and adverse weather exacted a heavy toll on Renda's dredging equipment, severely disabling the equipment.

20. In about May 1999, the Millennium arrived at the Mouth. Adverse weather slowed progress, and the Millennium was unable to complete the work. Adverse conditions also damaged the Millennium requiring that the Millennium undergo substantial repairs.

21. By about February 15, 2000, after numerous ill-fated attempts to complete the dredging at the Mouth, and after severely damaging its equipment, Renda requested that the Corps accept the work at the Mouth, and not force Renda to damage its equipment further.

22. Renda had shown the utmost of good faith in attempting to complete the dredging at the Mouth.

23. The Plug upstream of the Mouth still existed. There was no urgency or necessity to require Renda to incur the cost or to risk the damage to Renda's dredging equipment.

24. In the past, the Corps had simply deleted the dredging work at the Mouth under similar circumstances.

25. For Renda, however, the Corps conducted itself differently. The Corps secretly approached one or more of Renda's competitors to negotiate dredging work at the Mouth, at the expense of Renda.

26. The Corps then threatened to default terminate Renda if Renda did not complete dredging at the Mouth. The Corps issued a show cause notice, and advised Renda in no uncertain terms that the Corps would terminate Renda if Renda did not subcontract the Mouth dredging work to Weeks Marine.

27. The Corps, however, had been negotiating with Weeks Marine to dredge the Plug just upstream of the Mouth. The Corps could have, and should have, added the Mouth dredging work to the Plug work that the Corps planned to award to Weeks Marine.

28. At the time, Renda was a viable going concern in the marine dredging industry. Renda could not remain so if Renda had been default terminated on a Corps project.

29. As a result, and under duress, Renda had no choice but to subcontract to Weeks Marine the remaining work at the Mouth.

30. The Corps forced Renda to overpay Weeks Marine for dredging work at the Mouth.

31. Renda had to pay Weeks Marine much more than Renda would have received from the Corps for performing the Mouth dredging work.

32. The Corps' conduct in forcing Renda to subcontract work to Weeks Marine was arbitrary, capricious, and vindictive under the circumstances.

33. The Corps needlessly cost Renda $392,757.00 which Renda had to pay to Weeks Marine.

34. Renda is entitled to a repayment of such money under the circumstances.

**Increased Cost for Levee Repair at PA-105A**

35. PA-105A is a dredging spoil placement area. PA-105A is located on the north side of the Gulf Intercoastal Waterway ("GIWW") between GIWW stations 403+200 and 406+600.

36. Renda executed a subcontract with Affolter Construction to construct levees and to install drop outlet structures at PA-105A, as part of the Project.

37. After Affolter mobilized on the Project, and moved its levee construction equipment to PA-105A, Affolter encountered very wet conditions due to tidal action and encroachment flooding.

38. As a result, Affolter was required to build water breaks and dams to isolate the area where the levee construction was required.

39. Despite Affolter's best efforts, the levee that Affolter constructed or tried to construct collapsed and fell, costing Affolter significant time and money.

40. The problem with the unduly wet conditions at PA-105A, and with the unstable ground, was a differing site condition under the circumstances.

41. Renda submitted proper and timely notice of the PA-105A differing site condition.

42. The work by Renda and its subcontractor, Affolter, was made more difficult, costly, and time consuming by the PA-105A differing site condition.

43. Renda is entitled to be paid $134,245.00 in connection with the PA-105A differing site condition.

**Increased Cost for Dredging Due to Channel Alignment Discrepancies - GIWW Stations 375+00 to 385+00**

44. As part of Renda's work on the Project, Renda was required to dredge between GIWW Stations 375+00 and 385+00.

45. While dredging between those stations, Renda discovered that the GIWW channel prism was not aligned as described in the Contract Drawings for the Project.

46. To resolve the discrepancy, Renda incurred $399,569.00 in extra cost.

47. Renda is entitled to be paid by Defendant $399,569.00, and to be credited with at least two additional contract days.

**Variation in Estimated Quantities - GIWW Dredging**

48. Renda estimated its bid price for the dredging required in the GIWW based on the units listed in the Bid Schedule in the bid solicitation for the Project.

49. However, the actual amount of dredging required for the GIWW was substantially less than the amount listed in the Bid Schedule.

50. Because the actual quantity of dredging was so much less than the estimated amount, Renda's true costs per unit greatly exceeded the amount that Renda had estimated.

51. Due to the reduced quantity of GIWW dredging, Renda has suffered damages in the amount of $263,028.00.

52. Defendant is liable to Renda for such damages.

**Extra Contract Days**

53. Due to various causes beyond Renda's control, Renda is entitled to extra contract days for the Project.

54. Renda properly requested the extra days.

55. The Corps improperly denied the extra days.

56. Renda is entitled to at least 402 extra days under the contract for the Project.

**Wrongful Withholding of Liquidated Damages**

57. Renda originally had 276 calendar days to complete the Project.

58. The contract for the Project had a liquidated damages daily rate of $541.00.

59. During the course of the Project, Renda encountered differing site conditions and other causes that warranted extensions of contract time.

60. The Corps wrongfully denied the extensions, and, as a result, has wrongfully withheld at least $214,977 in liquidated damages from Renda.

61. The Corps has not properly calculated the number of days subject to liquidated damages.

62. The Corps did not reasonably calculate the rate of liquidated damages.

63. Defendant owes Renda payment of all the liquidated damages withheld from Renda on the Project.

WHEREFORE, Plaintiff, Renda Marine, Inc., respectfully prays that: (1) a true copy of this Complaint be served on Defendant, the United States of America, and that Defendant be required to appear and answer same; (2) after due proceedings, there be judgment in favor of Renda and against Defendant in accordance with the demands herein; (3) Renda be awarded all costs of this proceeding, together with its reasonable attorney's fees, and pre-judgment and post-judgment interest at the highest rates allowed by law; and (4) Renda receive all such other general and equitable relief as may be appropriate.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: ____________________________
Brian W. Erikson, TX Bar No. 06643800
Andrew M. Trusevich, TX Bar No. 00785119

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.