IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | CASE NO. 04-1786C |
| V. | § | |
| | § | (Judge Christine O.C. Miller) |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

# PLAINTIFF'S APPENDIX

Terry L. Salazar
Texas Bar No. 17527500
**QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.**
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 880-1857 (Telephone)
(214) 871-2111 (Telefax)

**ATTORNEY FOR RENDA MARINE, INC.**

# INDEX TO PLAINTIFF'S APPENDIX

**Document** **Page**

Defendant's Corrected Witness List ........ 1

Exhibit 52 - November 26, 2002 COFD ........ 11

June 26, 2007 Benero Deposition Transcript Excerpts ........ 19

Exhibit 17 – April 6, 2000 Benero email ........ 25

Exhibit 34 – August 15, 2000 Benero email ........ 31

January 8, 2004 Benero Deposition Transcript Excerpts ........ 32

August 23, 2001 Benero email ........ 35

RECEIVED
QSCL
RECEIVED
JUL 0 3 2006
QSCL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1786C |
| v. | ) | |
| | ) | (Senior Judge Bruggink) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S CORRECTED WITNESS LIST

Pursuant to paragraph 13(b) of Appendix A to the Rules of the Court of Federal Claims and the Court's June 9, 2006 Order, defendant, the United States, provides the following list of witnesses:

A. Fact Witnesses

1. MR. EDDIE R. FISHER
Manager of Coastal Stewardship
Texas General Land Office
1700 North Congress, Room 300
Austin, TX 77001
Tele: (512) 463-9215

Residence:

915 West Gibson
Austin, TX 78704
Tele: (512) 448-3162

Topic(s) of testimony: Contract documents; plaintiff's bid; oral and written communications between plaintiff and the Corps; plaintiff's acquisition of the dredge *Millennium*, including design, manufacture, and delivery of the *Millennium*; circumstances of late delivery of *Millennium* to plaintiff; performance of dredges *Millennium*, *St. Charles*, and *White Rock* at the Mouth of Colorado River; plaintiff's claims for extensions of time based upon restricted access to job site, late delivery of *Millennium* to plaintiff, unusually severe weather, and GIWW channel misalignment; Modification P00021; contract performance, including, but

not limited to, dredging at Mouth of Colorado River; plaintiff's bid in response to Solicitation No. DACW64-00-B-0008 issued on 1/3/00; plaintiff's suit against Dredging Supply Co., Inc. with respect to the dredge *Millennium* and related documents; and involvement in preparation of plaintiff's certified claim.

2. MR. STEVEN C. BOWMAN
1917 Easy Street
Arlington, TX 76013
Tele: (817) 795-3793

Topic(s) of testimony: Contract documents; plaintiff's bid; oral and written communications between plaintiff and the Corps; plaintiff's acquisition of the dredge *Millennium*, including design, manufacture, and delivery of the *Millennium*; performance of dredges *Millennium*, *St. Charles*, and *White Rock* at Mouth of Colorado River; subcontract between plaintiff and Weeks Marine to complete dredging Mouth of Colorado River navigation channel; meetings and other contacts with Corps related to performance of contract, including, but not limited to, plaintiff's dredging at the Mouth of Colorado River and subcontract between plaintiff and Weeks Marine to complete dredging at Mouth of Colorado River navigation channel; communications with Weeks Marine related to subcontract between plaintiff and Weeks Marine to complete dredging at Mouth of Colorado River entrance channel; plaintiff's suit against Dredging Supply Co., Inc. with respect to dredge *Millennium* and related documents; and plaintiff's certified claim.

3. MR. OSCAR RENDA
President, Oscar Renda Contracting, Inc.
#7 Benson Lane
Roanoke, TX 76262
Tele: (817) 430-0998

Topic(s) of testimony: Relationship between plaintiff and Oscar Renda Contracting, Inc.; involvement in preparation of plaintiff's bid; plaintiff's acquisition of dredge *Millennium*, including design, manufacture, and delivery of the *Millennium*; performance of dredges *Millennium* and *St. Charles* at the Mouth of Colorado River; subcontract between plaintiff and Weeks Marine to complete dredging Mouth of Colorado River navigation channel; meetings and other contacts with Corps related to performance of contract, including, but not limited to, dredging at the Mouth of Colorado River navigation channel and subcontract between plaintiff and Weeks Marine; plaintiff's suit against Dredging Supply Co., Inc. with respect to dredge *Millennium* and related documents; and plaintiff's certified claim.

4. MR. RUDOLPH J. RENDA
Vice President, Oscar Renda Contracting, Inc.
#7 Benson Lane
Roanoke, TX 76262
Tele: (817) 430-0998

Residence:

7003 Lismore Court
Colleyville, TX 76034

Topic(s) of testimony: Involvement in preparation of plaintiff's bid; plaintiff's acquisition of dredge *Millennium*, including design, manufacture, and delivery of the *Millennium*; performance of dredges *Millennium* and *St. Charles* at the Mouth of Colorado River; subcontract between plaintiff and Weeks Marine to complete dredging Mouth of Colorado River navigation channel; communications with Weeks Marine related to subcontract between plaintiff and Weeks Marine to complete dredging at Mouth of Colorado River navigation channel; meetings and other contacts with Corps related to performance of contract, including, but not limited to, dredging at the Mouth of Colorado River navigation channel and sub-contract between plaintiff and Weeks Marine; plaintiff's suit against Dredging Supply Co., Inc. with respect to dredge *Millennium* and related documents; and plaintiff's certified claim.

5. MR. BURSON WARREN
Project Superintendent, Oscar Renda Contracting, Inc.
#7 Benson Lane
Roanoke, TX 76262
Tele: (817) 430-0998

Residence:

1777 Timbercreek Road, Apt. 1822
Flower Mound, TX 75028
Tele: (972) 539-5289

Topic(s) of testimony: Plaintiff's acquisition of dredge *Millennium*, including design, manufacture, and delivery of the *Millennium*; performance of dredge *Millennium* at the Mouth of Colorado River.

6. MS. CAROL A. DEVANY
Contracting Officer
Johnson Space Center
National Aeronautics
and Space Administration
Mail Code BH
2101 NASA Parkway
Houston, TX 77058-3696
Tele: (281) 244-7267

Topic(s) of testimony:

Contract No. DACW64-98-C-0028 (Boggy Bayou Project): Contract award; contract documents; project correspondence, including, but not limited to 3/8/00 Show Cause Notice; contract administration, including, but not limited to, protest by King Fisher Marine Service of award of contract to plaintiff and appointment of administrative contracting officer and alternate administrative contracting officer for Boggy Bayou Project; meetings and other contacts with plaintiff's representatives related to plaintiff's performance of the contract, including, but not limited to, 3/8/00 Show Cause Notice.

Contract No. DACW64-00-C-0006 (between Weeks Marine and Government):

Contract award; contract documents; project correspondence; plaintiff's bid protest.

7. MR. THOMAS BENERO
Chief, Contracting Division
Galveston District
United States Army Corps of Engineers
2000 Fort Point Road
P.O. Box 1229
Galveston, TX 77553
Tele: 409-766-3899

Topic(s) of testimony:

Contract No. DACW64-98-C-0028 (Boggy Bayou Project): Contract administration; project correspondence, including, but not limited to 7/31/00 Show Cause Notice; meetings and other contacts with plaintiff's representatives related to performance of contract, including, but not limited to, 7/31/00 Show Cause Notice and subcontract between plaintiff and Weeks Marine to complete dredging at the Mouth of Colorado River navigation channel.

Contract No. DACW64-00-C-0006 (between Weeks Marine and Government):

Contract documents, including, but not limited to, Modification P00002 and Modification P00007 and related documents; project correspondence.

8. MR. WILLIAM J. HOPKINS
Chief, Project Operations Branch
Operations Division
Galveston District
United States Army Corps of Engineers
2000 Fort Point Road
P.O. Box 1229
Galveston, TX 77553
Tele: 409-766-3191

Topic(s) of testimony: Contract administration; project correspondence; plaintiff's performance of Boggy Bayou Project, including, but not limited to, dredging at Mouth of Colorado River; meetings and other contacts with plaintiff's representatives related to plaintiff's performance of Boggy Bayou Project; periodic progress payment estimates; and liquidated damages.

9. MR. DONALD W. CARELOCK
Assistant Area Engineer, Northern Area Office
Galveston District
United States Army Corps of Engineers
2000 Fort Point Road
P.O. Box 1229
Galveston, TX 77553
Tele: 409-766-3191

Topic(s) of testimony:

Contract No. DACW64-98-C-0028 (Boggy Bayou Project): Contract administration; project correspondence; plaintiff's contract performance, including, but not limited to, dredging at Mouth of Colorado River navigation channel and subcontract between plaintiff and Weeks Marine to complete dredging at Mouth of Colorado River entrance channel; meetings and other contacts with plaintiff's representatives related to plaintiff's performance of the Boggy Bayou Project; periodic progress payment estimates; Modification P00021, including related negotiations and documents; liquidated damages.

Contract No. DACW64-00-C-0006 (between Weeks Marine and Government):

Contract documents, including change order relative to dredging Station 34+300 to 35+300 at Mouth of Colorado River navigation channel (Modification P00002, Modification P00007); project correspondence.

10. MR. MICHAEL J. deMASI
Project Engineer, Northern Area Office
Galveston District
United States Army Corps of Engineers
2000 Fort Point Road
P.O. Box 1229
Galveston, TX 77553
Tele: 409-766-3191

Topic(s) of testimony: Contract administration; plaintiff's performance of Boggy Bayou Project, including, but not limited to, dredging at Mouth of Colorado River entrance channel and GIWW misalignment issue; meetings and other contacts with plaintiff's representatives related to plaintiff's performance of Boggy Bayou Project; periodic progress payment estimates; negotiations relating to Modification P00021.

11. MR. WARREN H. DENGLER
Project Engineer, Northern Area Office
Galveston District
United States Army Corps of Engineers
2000 Fort Point Road
P.O. Box 1229
Galveston, TX 77553
Tele: 409-766-3191

Topic(s) of testimony:

Contract No. DACW64-98-C-0028 (Boggy Bayou Project): Monitoring dredging operations of plaintiff at Mouth of Colorado River navigation channel and related documents, including, but not limited to, e-mail.

Contract No. DACW64-00-C-0006 (between Weeks Marine and Government): Quality assurance activities and related documents, including, but not limited to, Quality Assurance Reports during summer of 2000, e-mails, and photographs.

12. MR. JOHNNY ROZSYPAL
Chief, Operations Division
Galveston District
United States Army Corps of Engineers
2000 Fort Point Road
P.O. Box 1229
Galveston, TX 77553
Tele: 409-766-3191

Topic (s) of testimony: 8/3/00 meeting between representatives of plaintiff and the Corps relating to status of plaintiff's performance of Boggy Bayou Project and Upper Bayou Project; plaintiff's dredging at Mouth of Colorado River navigation channel.

13. MR. LUIS SAENZ
Project Engineer, Northern Area Office
Galveston District
United States Army Corps of Engineers
2000 Fort Point Road
P.O. Box 1229
Galveston, TX 77553
Tele: 409-766-3191

Topic(s) of testimony:

Contract No. DACW64-98-C-0028 (Boggy Bayou Project): Hydrographic surveys; processing of hydrographic survey data; generation of cross-sections from hydrographic survey data; calculation of volume of dredged material from cross-sections; identification of exhibits relating to hydrographic surveys for Boggy Bayou Project, including, but not limited to, before- and after-dredging surveys and dredged material volume calculations relative to Bid Item 0002 (GIWW); calculation of liquidated damages daily rate for Boggy Bayou Project, including identification of related exhibit.

Contract No. DACW64-00-C-0006 (between Weeks Marine and Government):

Before-dredging volume calculations relative to portions of Mouth of Colorado River navigation channel based upon July and August 2000 hydrographic surveys.

B. Fact Witnesses With Respect To Whom Government Intends To Offer Portions Of Transcript(s) Of Deposition Testimony

1. Mr. Eddie R. Fisher (Austin, TX).
2. Mr. Steven C. Bowman (Arlington, TX).
3. Mr. Oscar Renda (Roanoke, TX).
4. Mr. Rudy J. Renda (Roanoke, TX).
5. Mr. Burson Warren (Flower Mound, TX).

C. Expert Witnesses

1. GEORGE J. STRICKLER, P.E.
Capital Project Management, Inc.
Abington Hall, Suite 100
1777 Sentry Parkway West
Blue Bell, PA 19422-2210
Tele: (267) 464-0500

2. LEE E. HARRIS, Ph.D., P.E.
Associate Professor of Ocean Engineering
Department of Marine & Environmental Systems
Florida Institute of Technology
Link Engineering Building, Room E-210
150 West University Avenue
Melbourne, FL 32901
Tele: (321) 674-7273

Paragraph (3) of the Court's June 9, 2006 Order provides that the parties shall make their RCFC 26(a)(2) exchanges on or before August 14, 2006. The Government will provide plaintiff with the reports of its trial experts in accordance with that provision of the Court's June 9 Order.

PETER D. KEISLER
Assistant Attorney General

David M. Cohen

DAVID M. COHEN
Director

John Kosloske

OF COUNSEL:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

JUNE 30, 2006

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 30th day of JUNE, 2006, I caused to be sent by overnight mail service (next business day delivery) "DEFENDANT'S CORRECTED WITNESS LIST" addressed as follows:

TERRY L. SALAZAR, ESQ.
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, TX 75201

[signature]

GALVESTON DISTRICT, CORPS OF ENGINEERS
P.O. BOX 1229
GALVESTON, TEXAS 77553-1229

REPLY TO
ATTENTION OF

November 26, 2002

Contracting Division

Mr. Oscar Renda
Renda Marine, Inc.
522 Benson Lane
Roanoke , TX 76262

SUBJECT: Contract DACW64-99-C-0001
Houston/Galveston Ship Channel
Dredging Upper Bayou Project

Dear Mr. Renda:

This letter serves as a Contracting Officer counter-claim on Contract DACW64-99-C-0001, Houston/Galveston Ship Channel for items determined to be deficient or incomplete or not in accordance with the contract specifications.

On October 26, 1998, above referenced contract was awarded to Renda Marine, Inc., (RMI) in the amount of $12,526,100.00 to dredge approximately 3,483,700 cubic yards of material. Renda Marine was also responsible for building 381,300 cubic yards of mechanically constructed levees and building 13,700 lineal feet of hydraulically constructed levees. Contract completion was originally set at 18 February 2000 and through several modifications later revised to 28 June 2000. The Notice to Proceed was issued on 16 November 1998.

Each counter-claim is listed below with an explanation and dollar amount associated with each claim:

## FINDINGS OF FACT

I have attached my Findings of Fact and they are incorporated in this document.

## ANALYSIS

**a. Counter Claim No. 1: Dredging Section No. 9**

Modification CO-11, dated 18 September 2001, deleted the remainder of dredging for the project as stated in a Contracting Officer decision dated 01 June 2001.



ENGAD 800-631-6989
DEPOSITION EXHIBIT
52

The Government deleted the remainder of Section 9 under Modification P00028 dated 18 September 2001 due to your continued and protracted inability to accomplish the work in accordance with contract requirements. Your ineffective and inefficient hydraulic placement of material dredged from the channel resulted in wasting a large quantity of material inside the area instead of such being incorporated into the hydraulic levees. Deletion of the remainder of Section 9 put an end to any further damage to the area by the inefficient operation.

Approximately 135,000 cubic yards of "required dredging" remains to be removed within the channel template in Section 9 and will be removed by another contractor.

Modification P00029 dated 28 September 2001 decreased the total funded amount of the contract by $415,000.00, from $17,052,424.16 to $16,637,424.16. The $415,000.00 deduction is the result of the deletion of Section 9 on this contract.

Our estimate for completing this portion of the work is $2,067,000.00. This amount includes costs for mobilization, pipelines, two boosters and cost to dredge the remaining material from Section 9.

**b. Counter Claim No. 2: Sec. 7 Clay Misplaced Material**

On 20 October 2000, you submitted a letter alleging a differing site condition consisting of "Heavy Red Clay at North Side of Channel, Stations 565+00 to 580+00." The Government never considered this issue to have merit.

You encountered materials commensurate with what was reflected in the borings on the contract drawings, i.e., stiff clays. Hence, that material should have been incorporated into the hydraulic levees around Lost Lake Placement Area (LLPA) but you elected to stockpile such in lieu of what the contract required. The Government decided that it would be more prudent not to incur any further lost time due to inefficient levee construction methods exhibited by you at LLPA. This material is still in this location and will have to be recovered and used to rebuild the incomplete levees by another contractor.

The Government carefully considered your claim in this section, and as stated above, never considered it to have merit. Our estimated cost for excavating the misplaced material, placing it in trucks and hauling to the North Levee is $571,000.00.

**c. Counter Claim No. 3: Incomplete West Levee Realignment (Mechanical Portion Only)**

You failed to complete a significant portion of the west levee to the lines and grades in accordance with the contract specifications during the construction period.

The Government did not recommend that you relocate the completed portion of the levee between approximate levee stations 166+00 and 180+00, but only that work beyond station 180+00. This realignment was to improve the current site conditions and to assist you with your levee construction method. However, you made the decision to relocate this already completed portion of the levee.

In order to bring the levees to lines and grades as specified in the contract documents, the Government estimates it will cost $108,000.00 to complete the work. This work includes mobilization, cutting/hauling and filling material, bonds and contingency.

d. **Counter Claim No. 4: Incomplete, Non-Hydraulic North Levee**

Between approximate levee stations 15+00 to 40+00 you attempted to construct the North Levee mechanically instead of hydraulically displacing the soft foundation with dredged material as required by the construction contract. Consequently, the North Levee was never constructed to the lines and grades as required by the contract documents. You also failed to complete the North Levee to the lines and grades as specified by the contract documents. The contract clearly stipulates that the levees were to be placed hydraulically. This was a requirement so that the soft foundation material would be displaced during the hydraulic operations. Your ability to accomplish an effective and efficient hydraulic fill operation precluded such from occurring. It is apparent that your equipment and management of such were incapable of doing so.

It is noted in this area that you recovered misplaced material from the east side of the levee (one truckload at a time) to attempt to mechanically construct the North Levee. Again, the Government decided that it would be more prudent to delete the work and not incur any further lost time due to inefficient dredging or additional damages at LLPA.

Our estimated cost for another contractor completing the North Levee in accordance with the contract specifications is $3,413,000.00. This estimate includes mobilization of a large dredge capable of excavating new work material, pipelines and associated cost to dredge material from Sections 16-20 in the Mid-Bayou Reach.

e. **Counter Claim No. 5: Recovery of Misplaced/Wasted Material**

Again, due to your inefficiencies in your dredging operations, approximately 1.2 million cubic yards of suitable levee building material was wasted toward the interior of LLPA. A letter from the Bay Area Office, dated November 3, 2000, referenced an October 23, 2000 meeting that recommended continuing to reasonably recover the

misplaced and overplaced satisfactory material along the East Levee. Once again, the Government decided that it would be more prudent to cease any further Renda Marine recovery operations and delete the work and not incur any further lost time or additional damages at LLPA.

Subsequent to the Upper Bayou Contract, the Government contracted with a geotechnical consultant to take numerous soils borings at various locations within LLPA. The borings indicated that suitable levee building material had flowed to the interior approximately 1,000 feet from the levee toe on the east and west sides of LLPA. Also, the borings indicated that the suitable material varied in thickness from about 10 feet near the levee toe to about 1 foot at a distance of about 1,000 feet to the interior. As a result of this, the Government estimates that it will take at least 8 months for another contractor to recover this material and incorporate into the incomplete levees. This work is estimated to cost the Government $5,465,000.00.

**f. Counter Claim No. 6: Liquidated Damages**

At the present time the Government is withholding approximately $259,840.85 in retainage. In addition to this, we are withholding $236,016.00 in liquidated damages calculated by multiplying $528.00 per day multiplied by 447 days the Government estimates is beyond the contract completion date of 28 June 2000.

. To date the Government has refunded $252,000.00 to your company. The amount of $259,840.85 represents the balance remaining in retainage.

Total for all counter claims is summarized below:

| | |
|---|---|
| a. Dredging Section 9: | $2,067,000.00 |
| b. Sec. 7 Clay Misplaced Material: | 571,000.00 |
| c. Incomplete W. Levee Realign. (Mech. Portion Only) | 108,000.00 |
| d. Incomplete, Non-Hydraulic North Levee: | 3,413,000.00 |
| e. Recovery of Misplaced/ Wasted Material: | 5,465,000.00 |
| f. Liquidated Damages: | 236,016.00 |
| Total | $11,860,016.00 |

**FINAL DECISION**

Based upon the above stated facts, I hereby determine that Renda Marine, Inc., is indebted to the Government in the amount of $11,860,000.00 for the additional cost of correction of deficiencies under Contract DACW64-99-C-0001. I hereby direct Renda

Marine to submit a payment in the amount of $11,860.00 to me by Certified Check payable to "FAO USAED, Galveston."

Any amount not paid within 30 days from the date of this demand will bear simple interest from the date of this demand at the interest rate established by the Secretary of the Treasury as provided in Section 12 of the Contract Disputes Act of 1978 (Public Law 95-563), which is applicable to the period in which the amount becomes due, as provided in paragraph (b) of FAR 52.232-17, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

You may submit a proposal for deferment of collection if immediate payment is not practicable or if the amount is disputed. The proposal for deferment should provide the information required in FAR 32.613 and should provide information regarding a proposed bond or other collateral as required.

This is a final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 7th Floor, 5109 Leesburg Pike, Falls Church, Virginia 22041-3204. If you decide to appeal, you must mail or other otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you received this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals you may, solely at your election, proceed under the Board's small claims procedures for claims of $50,000.00 or less or its accelerated procedures for claims of $100,000.00 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims (except as provided in the Contract Disputes Act, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Sincerely,

Thomas Benero

Thomas Benero
Chief, Contracting Division
Contracting Officer

CF: Brian W. Erikson, Attorney at Law
John Kosloske, Dept.of Justice
Mike McClenan, Bay Area Office

## FINDINGS OF FACT

1. Solicitation (IFB) DACW64-98-B-0004 for Dredging Upper Bayou (45 foot project) in Harris and Galveston Counties was issued 16 June 1998. The solicitation was amended one time

2. Amendment 0001 dated 7 July 1998 incorporated questions from prospective bidders and provided answers by the Galveston District Design Team.

3. Bids were opened on 17 July 1998.

4. Five bids were received, the lowest being $12,526,100.00.

5. The Government estimate was $13,607,400.00 or approximately 9% higher than the Renda Marine, Inc., (RMI) bid.

6. RMI submitted the lowest bid of $12,526,100.00. Award of the contract was made on 26 October 1998. The Notice to Proceed was issued on 16 November 1998.

7. A total of 30 modifications were issued under this contract. Some modifications were issued unilaterally by the Contracting Officer and some bilaterally after mutual agreement by both parties.

8. On 8 March 2000, a Cure Notice was issued to RMI for what the Government considered RMI's failure to demonstrate that they could achieve satisfactory execution of the project within the times required by its terms.

9. On 4 April 2000, RMI responded to the Cure Notice. In their response RMI provided a contract summary to date and a proposed completion date. This response also provided a proposed production rate of dredged material and utilization of a booster pump. Also included in this letter was a dredging plan for completion of the project.

10. On 16 April 2000, the Government and the local sponsor of the project, the Port of Houston Authority (PHA), met with RMI and their surety to discuss progress of work on the Upper Bayou Contract and RMI's response to the Cure Letter issued 8 March 2000.

11. As a result of the 16 April 2000 meeting, on 25 April 2000, RMI was presented a letter outlining 4 conditions they had to meet in order to avoid being Terminated for Default. These were:

a. Maintaining a monthly production rate as stated in the dredging plan for completion of the project must be met for each pay period;
b. Work must be in accordance with the contract drawings and specs;
c. All materials suitable for constructing levees are to be utilized for levee building, and;
d. RMI was to provide an update of quality control personnel and responsibilities for each work area.

12. On 11 July 2000, a letter was issued to RMI stating that the dredging quantity stated in each pay period appeared reasonable and attainable. However, there was still some concern that the quantities of lineal feet of hydraulic levee proposed to be constructed per pay period appeared to be excessive. RMI was asked to review the proposed quantities and revise as appropriate. RMI was also told the 4 conditions in the Government's 25 April 2000 letter still applied.

13. On 6 October 2000, the Government requested RMI to submit a proposal for removing and disposing the debris on the north side of the channel between approximate channel stations 530+00 and 554+00.

14. Modification P00019 dated 27 October 2000, directed RMI to remove and dispose of the debris on the north side of the channel between approximate channel stations 530+00 and 554+00. This mod also increased the contract amount by $66,000.00 and added 4 calendar days to the contract.

15. On 6 November 2000, a Show Cause Notice was issued to RMI for failure to demonstrate they could achieve satisfactory completion of the project within the times required by its terms. This Show Cause Notice reiterated the 4 conditions of the 25 April 2000 letter. However, RMI continued to demonstrate their inability to complete this project by a definite date.

16. On 15 November 2000, RMI responded to the Show Cause Notice. As a result of this, the Government submitted a letter to RMI on 13 December 2000 responding to the 17 issues summarized in their letter. RMI was asked to submit Requests for Equitable Adjustments (REA's) for issues numbered 3, 4, 9 and 10 within 15 calendar days of receipt of our letter. These four issues were the ones the Government considered to have merit.

17. On 21 December 2000, the Government submitted another letter to RMI requesting an REA for a new differing site condition consisting of unknown obstructions on the south side of the channel between stations 634+90 and 635+00 and station 637+57. This was the result of a letter describing a new differing site condition submitted by RMI on 13 December 2000.

18. On 7 March 2001, RMI made an alternative proposal for project delays due to differing site conditions. RMI suggested that they would complete its dredging work at the North Slope of Dredge Section No. 5 and 6 and then move the

discharge line at Jacinto Port. The Government was to remove the remainder of Dredge Section No. 9 from the contract.

19. On 13 March 2000, RMI submitted a letter proposing furnishing approximately 250,000 cubic yards of clay material from a private contract to LLPA for hydraulic levee construction. As a result of this, Modification P00026 was issued adding up to 60 calendar days to the contract.

20. Modification P00023, dated 14 March 2001, established a revised contract completion date of 28 June 2000. It also provided for payment to RMI in the amount of $3,083,833.00 for dredge work completed in the flare area of the Houston/Galveston Navigation Channel.

21. Modification P00026 dated 4 May 2001allowed up to 60 calendar days to complete dredging from private sources and hydraulically placing it into the new levee template at Lost Lake Placement Area (LLPA). The modification provided for additional time allowed of up to 60 calendar days.

22. On 27 August 2001, the Government issued a letter to RMI directing them to remove any remaining pipelines or appurtenant equipment belonging to RMI from the LLPA.

23. Modification P00028 dated 18 September 2001, deleted the remaining unfinished dredging on the north levees between stations 4+00 and 40+00 and the remaining levee construction from the contract.

24. On November 6 and 7, 2001, the Contracting Officer issued 6 letters to RMI acknowledging receipt of various certified claims submitted by RMI between January thru October 2001. Breakdown of claims and dollar amounts are as follows:

| Claim | Dollar Amt. |
|---|---|
| Dredging S. Ferry Landing | $1,049,173.00 |
| Dredging Flare Area Clay | 4,691,688.00 |
| Delays due to HL&P Trans. Tower | 170,863.00 |
| Dredging Sec. 7 Clay | 1,083,779.00 |
| Realignment of West Levee | 789,600.00 |
| Dredging obstructions No. 1 (Sec. 4-8) | 2,126,083.00 |
| Dredging obstructions No. 2 (Sec. 9) | 1,158,642.00 |
| Delays due to Hydraulic Levees at LLPA | 6,258,853.00 |
| Total | $17,328,892.00 |

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

RENDA MARINE, INC. )
)
VS. ) NO. 04-1786C
)
UNITED STATES OF AMERICA )

*************************************************

ORAL DEPOSITION OF
THOMAS BENERO

JUNE 26, 2007
VOLUME II

*************************************************

THE ORAL DEPOSITION OF THOMAS BENERO, produced as a witness at the instance of the Plaintiff, and duly sworn, was continued in the above-styled and numbered cause on the 26th of June, 2007, from 10:08 a.m. to 3:38 p.m., before Gerard G. Richer, CSR in and for the State of Texas, reported by machine shorthand, at the offices of U.S. Army Corps of Engineers, 2000 Fort Point Road, Galveston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.





fa9b5dd0-f352-4f06-972c-2264c61b029b

Q. Your e-mail indicates that you are instructing Carol -- would that be Carol Devany?
A. Carol Devany.
Q. -- to issue or to proceed with a show cause letter, correct?
10:45 A. Correct.
Q. And you say in the second paragraph of your e-mail that you made the decision to go ahead with a show cause letter because you believed Renda is not
10:45 acting in good faith. Is that correct?
A. That's correct.
Q. As you used the term "acting in good faith" in this e-mail. What did you mean?
A. They were not forthcoming or forthright with
10:45 us about all of the problems that they were encountering at that time, the problems with the dredge.
Q. Well, when you say they were not forthright or forthcoming, what do you mean by that?
10:46 A. I believed at that time -- and I'm going again by memory and this is going back quite a few years -- that they were not telling us everything that we needed to know as far as the progress on the work, problems that they were encountering with the dredge at that
10:46 time. Therefore, we were at a high level of



frustration, and we wanted to get some kind of reaction from Renda Marine as to when they were going to complete this project.
Q. Do you believe Renda Marine had an obligation
10:46 to act with good faith in its dealings with the Corps under this contract?
A. Yes, I do.
Q. Do you believe that the Corps of Engineers equally had an obligation to act in good faith towards
10:47 Renda Marine in its dealings with the contractor on this project?
A. Yes, I do.
Q. Now, is your understanding of this mutual obligation of good faith in the dealings between the
10:47 Corps and the contractor, is it just limited to being forthright or forthcoming and disclosing information or does it go beyond that?
A. It goes beyond that.
Q. Can you give me what your understanding is of
10:47 the scope of this obligation of good faith as you understand it?
A. That Renda meets all its obligations that they are requested or required to meet in the performance of this contract from beginning to end. The entire
10:48 contract itself. To include the contract



specifications and anything else that is contained in the contract, including the clauses, abiding by the clauses, abiding by the terms and conditions, abiding by the specifications, everything that is contained in
10:48 the contract.
Q. What about with respect to the Government's obligation of good faith? What's your understanding of what that term "good faith" encompasses as it relates to the Government's actions towards the contractor?
10:48 MR. KOSLOSKE: Are you asking him what his understanding is of the implied covenant of good faith and fair dealing?
MR. SALAZAR: No. I'm asking him to explain what he -- what he understands is the
10:48 Government's good faith obligations under a contract with a contractor?
MR. KOSLOSKE: If you have an understanding you can -- you can give what your understanding is.
10:48 A. Okay. My understanding is this to show good faith: Once a contract is signed with a contractor, I expect the Government to be as fair as possible with the contractor.
If a contractor is running into problems
10:49 in his performance, then I would expect that we would



sit down and listen to the contractor, try to come to a resolution of the problem.
If he encounters a differing site condition, we would certainly take that into
10:49 consideration; i.e., visit the site and see if indeed what the contractor is stating is true, and hopefully again come to a resolution of that. In general those are my comments as far as that goes.
Q. Okay. One final question about Exhibit 16.
10:50 Did Mr. deMasi ever share with you his feelings about your decision to direct Carol Devany to issue a show cause letter?
A. I do not recall having that conversation with Mr. deMasi.
10:50 (Exhibit No. 17 marked)
Q. (By Mr. Salazar) Mr. Benero, I'm handing you what's been marked as Exhibit 17. It's a six-page exhibit that contains a number of e-mails, a string of e-mails. And just for identification purposes, note
10:51 that in the bottom right-hand corner the Bates number goes from RMZ-COE-04419 through RMZ-COE-04424, correct?
A. Correct.
Q. Okay. If you could take a few seconds to just familiarize yourself with this exhibit, I'm going to
10:51 ask you a couple of questions about it.







fa9b5dd0-f352-4f06-972c-2264c61b029b

Page 160

A. Okay.
Q. And now, the last four pages of this exhibit essentially consist of e-mails regarding a contact that the Corps received from a company called Five Star Dredging about some past due invoices to Renda Marine for work performed on the project and requesting some intervention or assistance in helping them get paid, correct?
A. Correct.
Q. I want to direct your attention to the second page of the exhibit. And this is in the middle of the page. There is an e-mail --
A. Excuse me. What page are you on exactly?
Q. The second page of the exhibit.
A. Okay.
Q. No, it will be from the front. This is the first page and the second page.
A. All right.
Q. Okay. If you look in the middle section of the second page, there is an e-mail that was sent by you on April 4th 2000 to a number of different people, correct?
A. Correct.
Q. And it's a reminder of a meeting scheduled with Renda Marine surety on Thursday, April 6th, and

Page 161

you say in your e-mail: I have spoken to the surety and they fully understand what we expect to hear from them, if the decision is made to terminate Renda for default on either the Upper Bayou or Mouth of the Colorado River projects. Do you see that?
A. Yes.
Q. First of all, do you recall your conversation with the surety that's being referenced in this e-mail?
A. Mr. Salazar, I do not remember any of this at all.
Q. Okay. Do you recall the fact that at the time you sent this e-mail in April of 2000 that Renda Marine was a contractor still performing or attempting to perform two projects for the Corps of Engineers, one on Upper Bayou and one here at the mouth of the Colorado?
A. Yes.
Q. And is it your recollection here today, based upon what's in your e-mail, that as of April the 4th 2000 that you had a meeting scheduled with Renda Marine's surety because the Corps of Engineers was considering termination for default on both of the projects, Upper Bayou and the Mouth of the Colorado? Correct?
MR. KOSLOSKE: Object to the scope of the question. This deposition is part of the case -- part

Page 162

of the lawsuit involving the Boggy Bayou project, not the Upper Bayou project. If where we're headed is into questions about the Upper Bayou project, I'll object on the grounds of relevance and instruct the witness not to answer any questions about the Upper Bayou project, but to confine his response to matters that pertain to the Boggy Bayou project.
MR. SALAZAR: Okay. Are you finished with your objection, John?
MR. KOSLOSKE: Right.
Q. (By Mr. Salazar) Okay. Do you understand the question, Mr. Benero?
A. Yes, but I will only respond to the mouth of the Colorado and Boggy Bayou project. That's it. So as far as a termination for default, I'm only going to answer on the Boggy Bayou, Mouth of the Colorado project.
MR. KOSLOSKE: Well, I think the question, and we can read it back, for starters was just do you remember a meeting about a possible default termination on both projects. I think you can answer that question. But if we get further questions that go into the details of a potential default termination on the Upper Bayou project, then I will object and instruct the witness not to answer. And when I return

Page 163

to Washington, I'll seek a protective order.
MR. SALAZAR: Can you read back the question, please.
(The requested material was read)
A. I understand the question, but I still want to restrict my answer to only discussing the Mouth of the Colorado project. I recall having a meeting or wanting to have a meeting concerning termination for default on the Mouth of the Colorado River project. I do not wish to comment on the Upper Bayou project.
MR. KOSLOSKE: Well, I'm not instructing you not to answer that question. So you can say if you have a recollection as to whether or not the meeting also was to address a potential default on the Upper Bayou project. I'll let you answer that much.
A. Then my answer will be that I vaguely remember having a meeting or scheduling a meeting to discuss both of those projects and a possible termination for default.
Q. (By Mr. Salazar) With respect to the mouth of the Colorado project, do you recall one of the issues that was of primary concern that prompted your request for a meeting of the surety being whether or not Renda Marine was going to finish dredging of Section 23 there at the mouth of the Colorado?





21

fa9b5dd0-f352-4f06-972c-2264c61b029b

on August the 10th at 8:19 a.m. and when Mr. Carelock send this out the next day, where a determination was made to proceed with a termination for default against Renda Marine?

14:05 A. Mr. Salazar, I would imagine so, but I don't remember any meetings.

Q. Do you recall any communications with Weeks Marine on or about this time frame where they were notified that the Corps was going to go ahead and

14:05 terminate Renda Marine and reprocure the completion of the work from them?

A. I do not have -- recall having those discussions with Weeks Marine.

(Exhibit No. 33 marked)

14:06 Q. (By Mr. Salazar) Let me hand you what's been marked as Exhibit 33. This is a two-page document dated August 15, 2000. It's a letter from Renda Marine to Steve Lane at Weeks Marine, correct?

A. Correct.

14:06 Q. And on the second page there are a number of signature blocks, including one for yourself. Correct?

A. Correct.

Q. Now, is that your signature above the signature block for Tom Benero?

14:06 A. Yes.



Q. And is that your handwriting indicating you signed it on August 18, 2000?

A. Yes, it is.

Q. Do you remember signing this letter agreeing

14:07 to the terms of it?

A. No, I do not remember signing the letter. But obviously I did sign it.

Q. Do you remember an arrangement being negotiated between the Corps, Renda Marine, Weeks

14:07 Marine, and Renda Marine's surety that resulted in this letter that everyone was asked to sign?

A. No, I don't remember those conditions or that meeting or that actually happening.

(Exhibit No. 34 marked)

14:07 Q. (By Mr. Salazar) I hand you what's been marked as Exhibit 34. That is one-page document that appears to be an e-mail from you to a number of individuals on August the 15th 2000, providing a recap of negotiations between Renda Marine, Weeks Marine, and

14:08 the Corps of Engineers regarding the project, correct?

A. Correct.

Q. Take a minute to review it and see if it refreshes your memory.

A. Okay.

14:08 Q. Is it fair to say that this e-mail is a recap



provided by you of the substance of the discussions and negotiations between the Corps, Renda Marine, and Weeks Marine concerning the completion of the work at the Mouth of the Colorado that was under Renda Marine's

14:09 contract?

A. Yes, it is fair to say that.

Q. And would it also be fair to say that if this arrangement had not been agreed to by Renda Marine, that you would have proceeded with a termination for

14:09 default action?

A. That probably would have been the next course of action, yes.

Q. Well, the second sentence of the e-mail says: This is in lieu of a termination for default, correct?

14:09 A. Correct.

Q. Look in Subparagraph A. The middle of the paragraph it says: There are approximately 59,000 cubic yards to be dredged at the mouth, Renda's remaining portion.

14:10 Do you see that?

A. Yes.

Q. Now, we saw some earlier exhibits that provided an update of Renda Marine's status of performance during the first part of August, correct?

14:10 A. Correct.



Q. And it would be fair to characterize, at least from August the 2nd through August the 10th, that it was too rough for Renda Marine to perform dredging activities with their equipment, correct?

14:10 A. Correct.

Q. Now, earlier when I asked you how much work was left for Renda Marine to accomplish in terms of dredging in July when they had the St. Charles back out working, you indicated you believed it was

14:11 approximately 90 to 95 thousand cubic yards. Do you remember testifying about that?

A. Yes.

Q. And this e-mail would indicate that that was probably overstated, correct, that it wasn't 90 to 95

14:11 thousand cubic yard?

A. No, no. It could have been. This is information that I don't know if it's 100 percent accurate or not, and I even indicated in this e-mail that it was 59,000 cubic yards, because I have seen

14:11 other information that stated that they had more than this. So at that time I don't recall why I said 59,000 cubic yards. It could have been that; it could have been a different figure. It could have been 90,000 cubic yards. We had an amount probably close to that.

14:11 I'll agree to that.

that?
A. Uh-huh.
Q. And it says: Based on the foregoing, I hereby determine that Renda is not entitled to the claimed
15:24 amount of $1,404,576 and 402 calendar days. My analysis reveals that Renda is entitled to $2,164 and no additional time extension.
Now, that $2,164 is the same amount that we saw earlier in an e-mail that was the remission of
15:24 four days of liquidated damages that had been improperly withheld, correct?
A. Correct.
Q. You conclude by saying: Renda's claim is therefore without merit to the extent the amounts
15:24 claimed exceeds the amounts listed above.
So, in all of the issues that Renda Marine submitted to you, including a request for 254 calendar days for unusually severe weather, you did not find that they were entitled to a single day's time
15:25 extension?
A. Again I went by the recommendation provided to me by Capital Management, the area office, and I accepted that recommendation and I signed this letter. I agreed with the recommendations.
15:25 Q. Well, Mr. Benero, earlier today we looked at



e-mails that you were copied on, that was very important to you back in August of 2001 when you were considering termination for default of Renda Marine and the status of their work on the project. Do you
15:25 remember that?
A. Yes.
Q. And you remember we saw that in a number of e-mails you got status reports from Mr. Carelock indicating that Renda Marine was not able to work
15:26 because the seas were too rough, correct?
A. Correct.
Q. Now, let's take a look at Page 6 of the contracting officer's decision. Take a moment and review the contents of Item 1-C, unusually severe
15:27 weather.
A. Okay.
Q. There is a reference in the second paragraph of this section of the contracting officer's decision to a specification Section 00820. Do you see that?
15:27 A. Correct.
Q. And the statement in this second paragraph is contrary to Renda's assessment, the contract specification cited, Section 00820, Paragraph 18, time extension for unusually severe whether is not for
15:27 dredging-related work. According to the note therein,



this provision specifically applies only to bid item No. 0005, levees, spillways and ditches. Thus it is not applicable to dredging at the mouth -- at the MOC and therein this request is denied.
15:28 Do you see that?
A. Yes.
Q. Do you recall going back and reading specification Section 00820?
A. I vaguely recall discussing this with Don
15:28 Carelock at that time.
Q. What was Mr. Carelock's communication to you, if you recall?
A. Just like is stated in this paragraph, that Section 820, Paragraph 18 related to levees, spillways
15:28 and ditches and not to dredging-related work.
Q. Did you go back and read the specifications section, sir?
A. I don't recall.
Q. Okay. So you relied upon Mr. Carelock's
15:29 interpretation of this specification section?
A. Yes, I did.
Q. Okay.
(Exhibit No. 51 marked)
Q. (By Mr. Salazar) Mr. Benero, I'm handing you
15:30 an exhibit marked as Exhibit 51. This is a copy of a



two-page e-mail string, and it appears that the first e-mail on it is from Don Carelock to Alex Petty that you are copied on, discussing the $2,164 allowed in the contracting officer's final decision being paid on
15:31 January 8, 2004. Do you see that?
A. Yes.
Q. There is a response to Mr. Carelock's e-mail from George Strickler that's the next e-mail in this string. Same date. And it states: Good. We are
15:31 going to ask Oscar and slash Rudy if they received the COD during this depositions next week. Do you hear any grumblings about how the COE depositions are going this week? They should be taking Tom's today.
Then there is a response from Don
15:32 Carelock to Mr. Strickler regarding his inquiry about how the depositions are going, correct?
A. Correct.
Q. Do you remember depositions being taken back in January of 2004?
15:32 A. Yes.
Q. Okay. Were those depositions being taken in regards to this project?
A. No. I don't -- I don't believe so, no.
Q. Mr. Benero, would you agree with me that
15:33 treating a contractor as fairly as possible and acting







fa9b5dd0-f352-4f06-972c-2264c61b029b

in good faith in your dealings with a contractor would not include taking actions in your contracting officer's capacity that would -- let me rephrase it -- that it would not involve taking actions in your capacity as contracting officer that you knew to be factually incorrect or legally invalid. Correct?

15:33

MR. KOSLOSKE: I'm going to object to the question. And unless you can explain how this is relevant to the Boggy Bayou project, I'm going to instruct the witness not to answer.

15:33

A. I refuse to answer.

MR. KOSLOSKE: Just --

MR. SALAZAR: What's your objection?

MR. KOSLOSKE: That it sounds like you're asking questions that relate to the November 2002 COD, and specifically Renda's contentions that that document was fraudulent. If you are not, then, you know, and you can, you know, explain where you're headed with this, fine. Otherwise I'm going to instruct the witness not to answer.

15:34 15:34

Q. (By Mr. Salazar) Well, the witness has already testified that in all of his dealings as a contracting officer involving Renda Marine on this project and other ear project, that he has acted in good faith and that he's always tried to treat them

15:34



fairly. So I'm asking him whether or not his description of acting in good faith includes taking action as a contracting officer that would be based on items that are not factually correct or that he knew to be legally invalid?

15:35

MR. KOSLOSKE: I don't see how the question is remotely related to any of the claims that are the subject of the present litigation, the Boggy Bayou project. We have no allegation in the complaint that -- or claim that's based upon a lack of good faith.

15:35

MR. SALAZAR: Are you instructing the witness not to answer the question?

MR. KOSLOSKE: To the extent that you're asking him about the November 2002 COD, yes, I am.

15:35

MR. SALAZAR: Okay.

(Exhibit No. 52 marked)

Q. (By Mr. Salazar) Mr. Benero, I'm going to hand you what's been marked as Exhibit No. 52 and ask you to take a moment to review it and tell me if you recognize it.

15:36

MR. KOSLOSKE: Object to the question and instruct the witness not to answer any questions about it. It's not within the purview of this litigation.

Q. (By Mr. Salazar) Mr. Benero, are you going to

15:36



answer the question?

A. No. I am not.

MR. KOSLOSKE: Counsel has instructed him not to answer. We can handle this one of two ways: We can adjourn the deposition immediately and as soon as I return to Washington, I can file a motion for a protective order, or we can continue with the deposition on matters that do not relate to the November 26, 2002 COD or the Upper Bayou project, and when we finish we can adjourn the deposition and when I return to Washington I'll file, as soon as we get a transcript, a motion for protective order with respect to any examination that goes to the Upper Bayou project or the November 26, 2002 COD.

15:36 15:37

MR. SALAZAR: Okay.

15:37

MR. KOSLOSKE: It's your choice how you want to proceed. We can stop right now -- I mean, if all you have for the rest of the deposition is to talk about this exhibit or matters relating to this COD, then I suggest, you know, that we are finished.

15:37

MR. SALAZAR: I assume that that would be your position, John, based upon the comments you made earlier. So that's why I've waited until the end of the deposition to bring it up so that, knowing that you already indicated that you were going to instruct the

15:38



witness not to answer the questions, we could go ahead and get that on the record and then we can go ahead and take it with the Judge in appropriate fashion, but then we can go ahead and, you know, conclude the deposition or, you know, adjourn it at this point and not consume any more of Mr. Benero's time this afternoon. Okay.

15:38

MR. KOSLOSKE: Fine.

MR. SALAZAR: Okay.





fa9b5dd0-f352-4f06-972c-2264c61b029b

**deMasi, Michael J SWG**

**From:** Rozsypal, Johnny SWG
**Sent:** Friday, April 07, 2000 1:11 PM
**To:** Benero, Thomas SWG; Buechler, Nicholas J COL SWG; Kohler, Harry G SWG; Krueger, Dalton H SWG; Keys, Daniel SWG; McClenan, Cecil M SWG; Russek, Eric G SWG; Devany, Carol A SWG; Smith, Lucille R SWG; Hopkins, William J SWG; deMasi, Michael J SWG
**Subject:** RE: Upper Bayou and Mouth of the Colorado River Projects-Renda Marine

Some points of clarification:

1. Renda said he needs 14 dredging days to complete MOC which equates probably a minimum of 60 calendar days for him.
2. From what B. Hopkins said, part of the consideration for not terminating now on MOC is that another dredge will not arrive any faster than the St. Charles (there's case law to support such). So we need to hold Renda to getting that dredge there when he said and if he doesn't arrive or arrives and accomplishes little or nothing, we poised to terminate and modify Weeks ongoing contract to complete the entrance channel that remains under Renda's contract. Everyone needs to remember how dissatified our local sponsor and the users have been regarding his performance at MOC.
3. As for Houston, I was, at first, surprised by the surety's response(full confidence in Renda's ability to finish) until I thought it through. The surety has nothing to lose and the most to gain by allowing Renda to finish. We waited to long to ask them to step in. To step in now and hire someone more capable to finish will cost them probably approx. $12 million or more (almost the full amount of the bond) and there's only about 4-5 million not paid to Renda. So his financial incentive is to convince us to let him dribble on so they don't have to cough up 8-9 million to have someone else finish.

-----Original Message-----
**From:** **Benero, Thomas SWG**
**Sent:** Thursday, April 06, 2000 4:16 PM
**To:** Buechler, Nicholas J COL SWG; Kohler, Harry G SWG; Krueger, Dalton H SWG; Keys, Daniel SWG; McClenan, Cecil M SWG; Russek, Eric G SWG; Devany, Carol A SWG; Smith, Lucille R SWG; Hopkins, William J SWG; deMasi, Michael J SWG; Rozsypal, Johnny SWG
**Subject:** Upper Bayou and Mouth of the Colorado River Projects-Renda Marine

As a result of the meeting held with Renda Marine and their surety this date, the following agreement was reached between the Port of Houston and the Corps:

**Mouth of the Colorado River Project**

a. Contractor will be allowed to return to the project when weather conditions improve at the mouth of the Colorado. This may be around the May or June timeframe. Liquidated damages at the rate of $541.00 per day will continue until completion of the project.
No plans to terminate contractor for default at this time.

b. Contractor plans to bring the Dredge St. Charles and estimates that it will take approx. two weeks to complete dredging. There are approx. 121,000 CY remaining to be dredged.

**Upper Bayou Project**

a. Based on his own production schedule, contractor will be allowed to continue on this project. Agreement reached not to terminate for default at this time.

b. Contractor will be issued a letter detailing what conditions we expect them to meet, again based on their own production schedule,i.e., dredging on a monthly basis the amount of cubic yards they indicated they would dredge as well as building the hydraulic levees at the rate they stated would be built.

c. If Renda fails to meet the quantities indicated in their schedule at any time during the next 6 months (Contractor states he can complete project by 30 Sep), we reserve the right to terminate for default at any time. Contract will be monitored very closely on a month to month basis. There are approx. 2.1 million CY of material remaining to be dredged. The date of 30 Sep is for removal of required contract quantities. Quantity overruns will come into effect around the October timeframe and a contract extension may be granted at that time.

d. Surety will be mailed a copy of the letter we plan to send Renda that list the conditions we expect them to meet



RMZ-COE-04419

DEPOSITION EXHIBIT 17

25

on a month to month basis.

e. Bay Area Office to check differing site conditions claimed by Renda. A certain amount of additional time may be granted based on the borings taken at the project site. Contractor is requesting a 100 day time extension. Once the amount of additional time is negotiated with Renda, contract will be modified accordingly. However, liquidated damages will begin at the conclusion of any additional time granted.

***BAY AREA OFFICES-In future contract modifications granting additional time to a contractor please indicate the number of days the contract is extended as well the "From and To" dates. As an example the paragraph should read as follows:

**Contract performance period is extended by 20 calendar days, from September 10 to September 30, 2000.**

Hopefully, this will eliminate any confusion on contract ending dates in the future.

Tom

## deMasi, Michael J SWG

**From:** Benero, Thomas SWG
**Sent:** Tuesday, April 04, 2000 10:45 AM
**To:** Rochen, George R SWG; Kohler, Harry G SWG; Hopkins, William J SWG; McClenan, Cecil M SWG; Russek, Eric G SWG; Meyer, Alton H SWG; Weiss, Lynwood G SWG; deMasi, Michael J SWG; Keys, Daniel SWG; Krueger, Dalton H SWG; Rozsypal, Johnny SWG; Smith, Lucille R SWG; Devany, Carol A SWG
**Subject:** Surety Meeting- Renda Marine

Just a reminder that the meeting with Renda's surety is Thursday, 6 Apr, in the executive conference room. I have spoken to the surety and they fully understand what we expect to hear from them if the decision is made to terminate Renda for default on either the upper bayou or mouth of the Colorado River projects.

Tom Benero

## deMasi, Michael J SWG

**From:** deMasi, Michael J SWG
**Sent:** Wednesday, March 22, 2000 10:33 AM
**To:** Hopkins, William J SWG
**Subject:** RE: Renda Marine, Sub-Contractor Questions

Talked with Ms Carter.
She said that on the Matagorda part Renda rented their dredge for 2 months, this was to do the circulation channel work. The are currently 30+ days on an $11,000 payment and a second invoice was due on 8 March 2000 for another $11,000. Thus they are due $22,000 according to Ms. Carter. She said they have been very slow to respond in the past, that is why they are calling. She said they don't want to wait 6 months before they get paid. I called Renda and talked with Leo Herrera, and he confirmed that they currently owe the $22,000 to Five Star.

-----Original Message-----
**From:** Hopkins, William J SWG
**Sent:** Wednesday, March 22, 2000 9:16 AM

**To:** deMasi, Michael J SWG
**Cc:** Cole, Curtis SWG; Devany, Carol A SWG; Sandoval, Paul SWG; McClenan, Cecil M SWG; Meyer, Alton H SWG; deMasi, Michael J SWG; McManus, John L SWG; Benero, Thomas SWG
**Subject:** RE: Renda Marine, Sub-Contractor Questions

Mike, get the number from John and find out any specifics you can about what they did for Renda on Matagorda. After that then give Renda a call to confirm what you are told. After that then let me know the specifics.

Thanks,
Bill

-----Original Message-----
**From:** **McManus, John L SWG**
**Sent:** Wednesday, March 22, 2000 8:59 AM
**To:** Benero, Thomas SWG
**Cc:** Cole, Curtis SWG; Devany, Carol A SWG; Hopkins, William J SWG; Sandoval, Paul SWG; McClenan, Cecil M SWG; Meyer, Alton H SWG; deMasi, Michael J SWG
**Subject:** Renda Marine, Sub-Contractor Questions

Mr. Benaro et al,

I got a call from a Mr. J.C. Carter of Five-Star Dredging yesterday. I returned the call this morning and spoke with Mr. Carter's wife.

She reported that her husband did some work for Renda Marine at Matagorda and had not yet gotten paid.

She also reported that they her husband had also done some work at Bolivar and that Renda told him to put some materials needed for the job on his personal credit card, and that he would get reimbursed. She reported the amount was $3,000, and Renda had not given them anything on the bill.

She is asking what can be done.

I asked her how her husband got my name and she reported that he had spoken to someone at Bolivar and that they had said that I might be able to help him.

I explained to Mrs. Carter that I was a Project Engineer on the Chocolate Bayou job with Renda, and that I was limited to taking any action with Renda to work affiliated with that contract. I told her that both the Matagorda and Bolivar jobs had different Project Engineers. I gave her Al Meyer's name and number for the Bolivar job.

I also told her I would speak to our Contracting Division to see if there was any way the Corps could intercede in their behalf or at least provide some advice on how their company could get reimbursed for their work. I mentioned that perhaps Renda's Bonding Company might be of some assistance. She stated that Renda had bonded themselves.

At any rate, I told her that I would try to find something out and have somebody from the Corps give her a call back.

Could somebody that knows more about these things than myself, please call this lady back and give her some guidance? If not I will call back and tell her the Corps can not

help her.

Thanks,

McManus

**deMasi, Michael J SWG**

**From:** McManus, John L SWG
**Sent:** Wednesday, March 22, 2000 9:34 AM
**To:** deMasi, Michael J SWG
**Subject:** FW: Renda Marine, Sub-Contractor Questions

409-423-6074 (good luck!)

I'm still going to wait for a reply from Contracting!

M

-----Original Message-----
**From:** **Hopkins, William J SWG**
**Sent:** Wednesday, March 22, 2000 9:16 AM
**To:** deMasi, Michael J SWG
**Cc:** Cole, Curtis SWG; Devany, Carol A SWG; Sandoval, Paul SWG; McClenan, Cecil M SWG; Meyer, Alton H SWG; deMasi, Michael J SWG; McManus, John L SWG; Benero, Thomas SWG
**Subject:** RE: Renda Marine, Sub-Contractor Questions

Mike, get the number from John and find out any specifics you can about what they did for Renda on Matagorda. After that then give Renda a call to confirm what you are told. After that then let me know the specifics.

Thanks,
Bill

-----Original Message-----
**From:** **McManus, John L SWG**
**Sent:** Wednesday, March 22, 2000 8:59 AM
**To:** Benero, Thomas SWG
**Cc:** Cole, Curtis SWG; Devany, Carol A SWG; Hopkins, William J SWG; Sandoval, Paul SWG; McClenan, Cecil M SWG; Meyer, Alton H SWG; deMasi, Michael J SWG
**Subject:** Renda Marine, Sub-Contractor Questions

Mr. Benaro et al,

I got a call from a Mr. J.C. Carter of Five-Star Dredging yesterday. I returned the call this morning and spoke with Mr. Carter's wife.

She reported that her husband did some work for Renda Marine at Matagorda and had not yet gotten paid.

She also reported that they her husband had also done some work at Bolivar and that Renda told him to put some materials needed for the job on his personal credit card, and that he would get reimbursed. She reported the amount was $3,000, and Renda had not given them anything on the bill.

She is asking what can be done.

I asked her how her husband got my name and she reported that he had spoken to someone at Bolivar and that they had said that I might be able to help him.

I explained to Mrs. Carter that I was a Project Engineer on the Chocolate Bayou job with Renda, and that I was limited to taking any action with Renda to work affiliated with that contract. I told her that both the Matagorda and Bolivar jobs had different Project Engineers. I gave her Al Meyer's name and number for the Bolivar job.

I also told her I would speak to our Contracting Division to see if there was any way the Corps could intercede in their behalf or at least provide some advice on how their company could get reimbursed for their work. I mentioned that perhaps Renda's Bonding Company might be of some assistance. She stated that Renda had bonded themselves.

At any rate, I told her that I would try to find something out and have somebody from the Corps give her a call back.

Could somebody that knows more about these things than myself, please call this lady back and give her some guidance? If not I will call back and tell her the Corps can not help her.

Thanks,

McManus

**deMasi, Michael J SWG**

| | |
|---|---|
| **From:** | Hopkins, William J SWG |
| **Sent:** | Wednesday, March 22, 2000 9:16 AM |
| **To:** | deMasi, Michael J SWG |
| **Cc:** | Cole, Curtis SWG; Devany, Carol A SWG; Sandoval, Paul SWG; McClenan, Cecil M SWG; Meyer, Alton H SWG; deMasi, Michael J SWG; McManus, John L SWG; Benero, Thomas SWG |
| **Subject:** | RE: Renda Marine, Sub-Contractor Questions |

Mike, get the number from John and find out any specifics you can about what they did for Renda on Matagorda. After that then give Renda a call to confirm what you are told. After that then let me know the specifics.

Thanks,
Bill

-----Original Message-----
**From: McManus, John L SWG**

RMZ-COE-04423

**Sent:** Wednesday, March 22, 2000 8:59 AM
**To:** Benero, Thomas SWG
**Cc:** Cole, Curtis SWG; Devany, Carol A SWG; Hopkins, William J SWG; Sandoval, Paul SWG; McClenan, Cecil M SWG; Meyer, Alton H SWG; deMasi, Michael J SWG
**Subject:** Renda Marine, Sub-Contractor Questions

Mr. Benaro et al,

I got a call from a Mr. J.C. Carter of Five-Star Dredging yesterday. I returned the call this morning and spoke with Mr. Carter's wife.

She reported that her husband did some work for Renda Marine at Matagorda and had not yet gotten paid.

She also reported that they her husband had also done some work at Bolivar and that Renda told him to put some materials needed for the job on his personal credit card, and that he would get reimbursed. She reported the amount was $3,000, and Renda had not given them anything on the bill.

She is asking what can be done.

I asked her how her husband got my name and she reported that he had spoken to someone at Bolivar and that they had said that I might be able to help him.

I explained to Mrs. Carter that I was a Project Engineer on the Chocolate Bayou job with Renda, and that I was limited to taking any action with Renda to work affiliated with that contract. I told her that both the Matagorda and Bolivar jobs had different Project Engineers. I gave her Al Meyer's name and number for the Bolivar job.

I also told her I would speak to our Contracting Division to see if there was any way the Corps could intercede in their behalf or at least provide some advice on how their company could get reimbursed for their work. I mentioned that perhaps Renda's Bonding Company might be of some assistance. She stated that Renda had bonded themselves.

At any rate, I told her that I would try to find something out and have somebody from the Corps give her a call back.

Could somebody that knows more about these things than myself, please call this lady back and give her some guidance? If not I will call back and tell her the Corps can not help her.

Thanks,

McManus



RMZ-COE-04424

**Carelock, Donald W SWG**

**From:** Benero, Thomas SWG
**Sent:** Tuesday, August 15, 2000 4:22 PM
**To:** Buechler, Nicholas J COL SWG; Maurer, Herbie A SWG; Kohler, Harry G SWG; Kieslich, James M SWG
**Cc:** Keys, Daniel SWG; Rozsypal, Johnny SWG; Carelock, Donald W SWG; Kuhne, Patrick A SWG; Saenz, Luis F SWG; Barcak, Ronnie G SWG; Peel, Robert W SWG
**Subject:** Renda Marine-Mouth of the Colorado River

Gentlemen, after much intense negotiations with Renda Marine and Weeks Marine the final negotiations were concluded for the Mouth of the Colorado River. This is in lieu of a Termination for Default:

a. Renda was able to strike a deal with Weeks Marine (subcontract) where Weeks will bring in early next week the Dredge R.S. Weeks to complete Renda's remaining portion of their contract. The R.S. Weeks is an ocean-going dredge with 11 ft. draft. Can work in inclement weather much better than the Dredge Venture or the Dredge St. Charles. The R.S. Weeks will be coming from Louisiana. There are approximately 59,000 CY to be dredged at the mouth (Renda's remaining portion). The work will be done at $3.00 a CY. Renda has agreed to wire the money to Weeks for this portion of the work.

b. Renda and the Corps will split 50/50 the costs for mob and demob for a "plug" of approximately 1,000 ft. between Weeks and Renda's contracts. It is estimated that it will cost both Renda and the Corps $200K each for this portion of the contract. The Corps will also pay Weeks for dredging costs in the plug. A separate mod will be negotiated with Weeks for this work. In the meantime, a NTP mod will be sent to Weeks to begin work immediately.

c. It is estimated that the total cost for all this will be $750K. Corps will pay roughly $177K for the plug and $200K for mob and demob costs.

Tom

E

DEPOSITION EXHIBIT 34

VGAD 800-631-6989

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., Plaintiff,

vs. CASE NO. 02-306C

THE UNITED STATES, Defendant.

ORAL DEPOSITION

THOMAS BENERO

January 8, 2004

ORAL DEPOSITION OF THOMAS BENERO, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 8th day of January, 2004, from 9:02 a.m. to 5:06 p.m., before Stacey Whitley, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of the United States Corps of Engineers, 2000 Fort Point Road, 2nd Floor, Galveston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



dcb037a9-62bf-46a9-8727-5d8a1986a4ba

directly to the Defense Contract Audit Agency but I do not remember me personally asking Mr. Rozsypal to send that document to DCAA.
Q. Now, if you'll look at Rozsypal Exhibit 4, at the very bottom, there's a copy furnished to Curtis Cole. So, maybe Mr. Cole had some involvement in forwarding Mr. Rozsypal's memo.
A. It could have been.
Q. Okay.
A. And I would have to surmise from that that he had permission from Mr. Cole to do this.
Q. Do you know much about soil borings, or do you defer to your geotechnical people and other engineers?
A. I defer to my geotech people.
Q. For example, you don't know how many soil borings are necessary for a project, things like that, right?
A. You are getting into an area, sir, that I have very little knowledge of.
Q. And when it comes to a differing site condition that involves soil borings, you defer to the judgment of the technical people you rely on, right?
A. Correct.
Q. Now, when we deposed Mr. Rozsypal, we learned that or Mr. Rozsypal testified that during the pre-award investigation of Renda and the Great Lakes bid protest,



Mr. Rozsypal was against awarding the contract to Renda. Do you happen to recall that?
MR. PETTY: Object to the form of the question.
A. Mr. Rozsypal made comments to me directly that he did not feel comfortable in awarding this contract to Renda Marine at that time because, number one, the lack of equipment that Renda had at that time. Number two, the project itself was a fairly complicated project. And based on the experience that Renda had submitted at that time from other work that they had done up in the Dallas area, he did not feel comfortable. And he voiced that opinion to me and legal counsel at that time. But that was the extent of it.
Q. (BY MR. ERIKSON) Okay. Now, you had had meetings with Eddie Fisher before the contract was awarded, right?
A. If I remember correctly, I probably had a meeting with Eddie Fisher that had to do with the mistaken bid, the information that he had submitted. Because normally we will ask a contractor for the working papers, which becomes part of the documentation that goes forward to division for their review and concurrence or nonconcurrence.
Q. Did you learn about Mr. Eddie Fisher's experience concerning dredging and dredging projects like the levees for Lost Lake?
A. The first time that I learned about Mr. Eddie Fisher's experience was in the documentation that was



submitted about himself and the kind of experience that he had and other dredging firms that he had worked for prior to coming over to work for Renda Marine.
Q. And you learned that in the pre-award investigation --
A. Yes.
Q. -- phase, right?
A. Yes.
Q. So, simply because a dredging contractor might be new doesn't mean it wouldn't have experienced people, right?
A. That is correct.
Q. Because if you're a brand-new dredging contractor, you might not have any projects whatsoever?
A. That is correct.
Q. Although your people might have done hundreds of projects?
A. That is correct.
Q. Now, we also learned during the deposition of Mr. Rozsypal that he was a proponent for terminating Renda for default on the Upper Bayou project. Do you recall Mr. Rozsypal voicing opinions like that?
MR. PETTY: Object to the form of the question.
A. After a period of time -- and I want to say approximately six months to one year after the contract was awarded to Renda Marine -- Mr. Rozsypal did express his



feelings to me, engineers, the other engineers, the Joint Venture, that he favored terminating Renda Marine for default based on the progress of Renda Marine at that time on this contract.
Q. (BY MR. ERIKSON) Progress or lack thereof?
A. Or the lack of progress, yes.
Q. Now, Mr. Rozsypal apparently felt that there should be greater progress than there was, right?
A. Not only Mr. Rozsypal but also the Government and the Joint Venture and the Port of Houston.
Q. And by that time Renda had submitted notices of differing site condition and other notices of problems that Renda was having that Renda contended weren't Renda's fault, right?
A. That is correct. Yes.
Q. Now, ultimately Renda was not terminated for default, correct?
A. That is correct.
Q. What did the Government do ultimately with this project? What happened?
A. Ultimately?
Q. Yeah. What's the paperwork show? Dealing with Renda, what does the paperwork show? We're going to get into some of it. What does the paperwork show?
A. The paperwork shows that Renda completed the





dcb037a9-62bf-46a9-8727-5d8a1986a4ba

Page 58

majority of its contract with the exception of Section 9. We terminated a portion -- we, the Government -- a portion for the convenience of the Government on Section 9 and that was the end of the contract.
Q. Okay. Let's talk about Section 9 for a second. Section 9 had a number of obstacles that Renda was encountering, right?
A. Right.
Q. So, the Government terminated for convenience because of the obstacles, correct?
A. Not only because of the obstacles but also because of the condition that the Joint Venture, the Port of Houston, and the Government felt that Renda was not doing the kind of work, the quality of work that they wanted Renda to do in Section 9. And so, they came to us, me, the contracting officer, and asked that a termination for convenience notice be issued to Renda Marine and that we would subsequently readvertise and award that portion of the Section 9 that was not completed to another contractor.
Q. Now, as you understand a termination for convenience, what that does is it sort of liberates the contractor from having to perform that sort of work, right?
A. That is correct.
Q. So, the Government doesn't have to pay the contractor any more for doing work in that area and the

Page 59

contractor no longer has any obligations concerning that area; is that correct?
A. That's correct.
Q. Now, the contractor may have a termination for convenience claim because they may have incurred costs?
A. They are entitled to certain costs under the FAR regulations, that is correct.
Q. Now, at the time that -- I assume it was you that signed the termination for convenience concerning Section 9?
A. I believe I was but I'm not a hundred percent sure.
Q. Okay. You knew it was happening, right?
A. Yes.
Q. At the time the termination for convenience occurred concerning Section 9, was there anybody with the Government that issued a notice, wrote a letter, did anything to indicate that Renda would be held accountable for some costs concerning Section 9?
A. Would you repeat the question, please?
Q. At the time that the termination for convenience was issued for Section 9, was there any written communication to Renda indicating that the Government would hold Renda accountable for some future costs concerning Section 9?
A. I'm not aware of that, no. I don't recall.
Q. Now, ordinarily if you want to hold a contractor responsible for some future costs concerning some work, you

Page 60

would issue a termination for default, right?
A. You can issue a termination for default if you want to hold the contractor accountable for some costs at a later date in addition to a counterclaim that the Government is entitled to submit against any contractor for costs that they believe the contractor is obligated to pay.
Q. Let's talk about Section 9 since we're on Section 9. What sort of obstacles was Renda running into?
A. The placement of the dredge material. The Joint Venture, the Port of Houston, the Government was not very happy with the quality of the work that was being performed out there. Those are primarily the biggest obstacles. The alignment of the levees themselves. If I recall correctly, these are some of the issues that came out and were of great concern to many people.
Q. Okay. Maybe I need to refine my question.
A. Okay.
Q. Renda provided a notice of differing site condition concerning subsurface -- subwater surface obstacles, debris, things that Renda was running into in dredge Section No. 9. Do you recall that?
A. Correct.
Q. What sort of things was Renda running into that Renda was having trouble dredging in Section 9?
A. The only thing that I can recall at this time was

Page 61

that Renda felt that the material out there was too soft. It was not the kind of material that you would normally use to build levees that should have been built, when they expected to find clays or stiff clays. That is the only issue that I can recall right now. So, Renda felt because of that they were not able to construct the levees in accordance with the specifications in the contract.
Q. Did you formulate any opinion based on the technical information you received about the quality of the clays or levee building materials in Section 9?
A. Me personally, no.
Q. So, you didn't know whether Renda was right or Renda was wrong?
A. I based my opinion -- and I can only say this because of the technical information that I received from the engineers, I react on that. And if they tell me that Renda was not performing in accordance with the specifications, I take it on face value, since they are the experts and they are the engineers, that they are correct. I have to protect the Government.
Q. The information that you received, did it indicate one way or another about whether the material to be dredged in Section 9 was suitable for levee building?
A. No, I don't.
Q. You don't recall or you didn't receive anything like

**From:** Benero, Thomas SWG
**Sent:** Thursday, August 23, 2001 8:34 AM
**To:** McClenan, Cecil M SWG
**Subject:** RE: Upper Bayou Project-Award of Claim Merit

OK, but please let Barry know this so he doesn't keep bugging you for dates.

-----Original Message-----
**From:** McClenan, Cecil M SWG
**Sent:** Thursday, August 23, 2001 8:23 AM
**To:** Benero, Thomas SWG; Keys, Daniel SWG
**Cc:** Russek, Eric G SWG; Krueger, Dalton H SWG
**Subject:** RE: Upper Bayou Project-Award of Claim Merit

Scheduled date is pending completion of George Strikler's analysis, coordination of analysis with the JV, and then development of the POM.

-----Original Message-----
**From:** Benero, Thomas SWG
**Sent:** Thursday, August 23, 2001 8:05 AM
**To:** McClenan, Cecil M SWG; Keys, Daniel SWG
**Cc:** Russek, Eric G SWG; Krueger, Dalton H SWG
**Subject:** Upper Bayou Project-Award of Claim Merit

Mike, as you already know, I received an E-mail message from Barry Smith stating that you have awarded merit for both obstruction claims, i.e., (1) Differing Site Conditions between stations 570+00 and 630+00 (Sections 4 thru 8), and (2) Differing Site Conditions between stations 660+00 and 685+00 (Section 9).

Barry also indicated that both of these REA's have been converted to Certified Claims and merit should come from me. If that is the case he is correct.

Barry also wants to know what George Strickland's status or position is in all these issues. I don't blame them, I would also like to know if I were the contractor. So Dan, my question to you is, "have we officially hired Mr. Strickland via a purchase order or other contractual vehicle?" If not, we need to do so like real quick!!!

Mike, have we scheduled a date yet to begin negotiating all these issues with Renda? Please let me know.

Tom

RM-GAL-0013318